Whittemore v. Hamilton.

---

FRANK H. WHITTEMORE AND OTHERS *vs.* JOHN A. HAMILTON AND ANOTHER, EXECUTORS.

*H*, who held in his own name, but for the benefit of *W*, a second mortgage on an unfinished building, as collateral security for a large indebtedness of *W* to him, at the request of the mortgagor and to enable him to raise money on the property to finish the building, released the mortgage and gave up the mortgage note, on the parol promise of the mortgagor when the building was finished to give him another mortgage of the same amount on it. *W* had no knowledge of the transaction. The mortgagor never completed the building or gave a new mortgage, and was personally bankrupt. *H* died soon after. In a suit of *W* against his executors for an account of the security placed in his hands, it was held—

1. That the claim on *H* for the wrongful release of the security did not die with him, but was good against his estate.

2. That sundry prior acts of *H* with regard to the property which were expressly assented to by *W*, could not establish his authority to release the security without *W's* assent.

3. That after the release was given the neglect of *W* to give notice of his

Whittemore v. Hamilton.

dissent did not operate to ratify the act; that principle applying only to a case where the party neglecting to give such notice is benefited or the other party injured thereby, and not to a case where the security is converted or destroyed.

4. That subsequent payments by *W* to *H* on his indebtedness to him did not ratify *H's* act in releasing the security, it appearing that his indebtedness to *H* was much beyond the value of the security released.

5. That *W's* conduct could not operate as an estoppel against him, inasmuch as *H* had in no way changed his conduct by reason of it.

*H* by his will had given a legacy to *W*, who was his nephew, and had provided that all indebtedness of any of the legatees to him should be deducted from their legacies. Held that *W's* suit, which was brought for the purpose of applying the value of the security on his indebtedness and determining the amount of the indebtedness remaining to be paid, was not to be regarded as conflicting with his position in claiming the legacy.

The testator had referred to the indebtedness of *W* in his will, in what he called "a partial list" of claims referred to in the condition of the legacies, as follows:—"A claim against *W* for $7,000, with interest from January 1st, 1879; also sundry notes against him in addition, amounting to several thousand dollars, which notes will show the amount." Held that this description was to be regarded as given only for purposes of identification, and not as fixing the amount to be deducted from the legacy.

[Argued June 19th—decided Sept. 7th, 1883.

SUIT for an account and for damages; brought to the Superior Court. The defendants were executors of Samuel Hamilton. Facts found by a committee, and judgment rendered for the plaintiff, (*Andrews, J.*) Appeal by the defendants. The case is sufficiently stated in the opinion.

*R. D. Hubbard* and *W. K. Townsend*, for the appellants.

*T. E. Doolittle* and *W. L. Bennett*, for the appellees.

LOOMIS, J. This is a complaint by Frank H. Whittemore and his assignees against the executors of Samuel Hamilton, deceased, for an account, and particularly to have the value of a certain mortgage belonging to Whittemore, but released by Hamilton while he held it as collateral security, charged against his estate in taking the account.

It appears that Whittemore had borrowed from Hamilton, who was his uncle, divers sums of money, amounting

in all to thirteen thousand seven hundred and seventy-three dollars, and had given various collaterals to secure the debt. In April, 1875, he assigned to Hamilton as an additional collateral a note from one Carll for $20,000, secured by a second mortgage on property in New Haven known as the Carll Opera House property. There were three first mortgages on different parcels of this property, amounting in all to fifty thousand dollars, besides interest and taxes.

In December, 1877, Warner, the holder of the first mortgages, brought a suit for foreclosure for interest against Carll and Hamilton, and in January, 1878, Hamilton brought a suit for foreclosure against Carll. Carll did not redeem any of the mortgages. Hamilton, on the last day limited, paid interest and costs amounting to $6,435.66 on a part of the mortgages, and by an arrangement with Warner a mortgage amounting to forty thousand dollars was allowed to remain upon a part of the property —the remainder being foreclosed. Hamilton subsequently paid to Warner interest accruing subsequently to the foreclosure, amounting to five hundred dollars, and then, with the consent of Whittemore, released all the interest held by him and belonging to Whittemore to Carll, who gave back to Hamilton (but for the benefit of Whittemore) a new note for twenty-four thousand dollars, secured by mortgage on that part of the opera house property which was subject to the forty thousand dollar mortgage; and this is the mortgage and note in controversy, which, although taken in Hamilton's name, was to be held by him only as collateral security.

These two mortgages exceeded the value of the property. Carll had become insolvent and was not able to proceed with the building of his opera house, then partly erected, and no one would advance money upon the property as it then stood. Under these circumstances, in December, 1878, Carll applied to Hamilton to have him release the twenty-four thousand dollar mortgage so that he might obtain funds on the credit of the property to enable him to complete the

building. Hamilton, without the knowledge of Whittemore, complied with the request, and released the mortgage and surrendered the note to Carll, stating in the deed of release that the note had been fully paid and cancelled. There was no consideration whatever for this release except the mere verbal promise of Carll that when he should complete the building he would give back another mortgage upon the property to secure another note of the same amount, which was never done. The court below found that the estate of Hamilton was liable to Whittemore for the value of the mortgage released and settled the account accordingly. The defendants, in bringing the case before this court for review, assign a great number of errors, but they all converge in the one question—whether the estate of Hamilton must account to Whittemore for the value of the security released.

The legal proposition upon which the action of the court below was predicated, namely, that if a person wrongfully converts or releases a pledge which he holds as collateral security, so that the owner loses the benefit of it, he is liable to account for its value, is too well settled to require the citation of authorities.

1. But the defendants contend, in the first place, that the conversion being a tort, the cause of action died with the wrong-doer, so that the executors in this case are not liable. We think the principle is not applicable to this case. The action is not in tort, but is a proceeding in equity for an account. When Hamilton wrongfully released the pledge which he held as collateral security for the debt which Whittemore owed him, equity at once applied the value upon the debt, so that it was a payment *pro tanto* made in the life time of Hamilton. *Peacock* v. *Pursell*, 14 Com. Bench. (N. S.), 728; *Cocke* v. *Chancey*, *Admr.*, 14 Ala., 65.

The action may also be considered as founded on the contract of bailment entered into by Mr. Hamilton in his life time when he received the pledge, and which he violated when he suffered it to go out of his hands and failed to apply it on the debt as he agreed to do; so that it

is really immaterial whether the form of remedy in this case is considered one in tort or in contract. *Booth* v. *Northrop,* 27 Conn., 325–331; *Dayton* v. *Lynes,* 30 Conn., 354.

2. The defendants contend, in the second place, that upon the facts found and the transactions between the parties before the surrender of this security, the court should have found that Hamilton had ample authority as the agent of Whittemore to make the surrender.

The facts relied upon under this head, considered in the most favorable light, can only furnish some slight ground for an inference that an agency existed. This evidence spent its force before the committee and resulted in finding no agency as matter of fact; and surely there is nothing upon which to predicate agency as matter of law. Aside from the relationship of uncle and nephew between the parties, which proves nothing, except perhaps a probability that an agency might exist with less formality as to the appointment than we would look for in other cases, there are no facts except those involved in the history of the case, namely:—the indebtedness of Whittemore to Hamilton and the assignment of collaterals for security; the advance by the latter of funds to pay accrued interest and to redeem prior mortgages; the foreclosure of Carll by Hamilton; the subsequent quit claim by the latter to the former; and the subsequent quit claim to Carll and the taking back from him by Hamilton of a new note and mortgage, being the one in question. A course of dealing will often lay the foundation for a presumption of agency, but the facts here have no such significance, because in every instance where the action of Hamilton affected the interests of Whittemore, the committee finds that he had knowledge and gave his express consent, whereas when Hamilton came to surrender the mortgage in question there was neither knowledge nor consent on the part of Whittemore. As between the parties it cannot be claimed that an express consent given in the prior cases will imply a consent given in the last transaction.

3. But under this head of agency we believe the defen-

dants chiefly rely upon Whittemore's conduct subsequent to the surrender as amounting to an acquiescence in and ratification of the act. And here too it will be observed that the committee finds that Whittemore did not approve or ratify the act in question, unless the facts found amount in law to such approval or ratification. The defendants contend as matter of law that the mere neglect of the principal to give notice of his dissent within a reasonable time after knowledge of the act of the agent of itself amounts to acquiescence and ratification, and they cite in support of the position 2 Kent's Commentaries, 616, Story on Agency, §§ 255 to 258, and *Clarke* v. *Dutcher*, 9 Cowen, 674, where the doctrine is stated substantially in the language of the claim. But we think it must be understood that the principle was intended to apply only to those cases where the alleged principal receives a direct benefit from the act of the alleged agent, or where the latter appears to have been prejudiced by the neglect of the former to give him notice of dissent. If one holding property pledged to secure a debt should destroy it, or convert it to his own use, or give it away to another, whereby it becomes lost to the owner, does he ratify the act by mere neglect to give notice to the wrong doer of his dissent? As well might the principle be applied to a trespass or any other tort.

In the case under consideration, after Hamilton who held the title had released the mortgage, it was gone forever, unless indeed Carll at some future time should have both the pecuniary ability and the disposition to restore it. Nothing which Whittemore could do would recall it, and the same was true as to Hamilton, so that nothing was to be gained or lost either by assent or dissent on the part of Whittemore. It will not do to say that here was a benefit because, if Carll should happen to succeed in raising the money and completing the building and should then re-mortgage it, there would be a benefit. If a pledgee should give away the property pledged upon the promise of a bankrupt that if he was ever able he would restore property

more valuable, it would hardly be claimed to be an act for the benefit of the original owner of the property pledged.

For these reasons we think the rule invoked in behalf of the defendants cannot apply to the case at bar, except under the qualifications we have indicated. In *Mobile & Montgomery R. R. Co.* v. *Jay*, 65 Ala., 113, the rule was so qualified. See also remarks of DEWEY, J., in *Brigham* v. *Peters*, 1 Gray, 147. But certain positive acts of Whittemore after knowledge that the security had been surrendered are referred to in order to show that the act was ratified by him. These acts are the following:—he induced Hamilton to join with him in an attempt to obtain a reconveyance from Carll; he brought a suit in the name of Hamilton against Carll, which was afterwards withdrawn, he paying the expenses; and then he continued for some eighteen months to make payments on account of his indebtedness to Hamilton. Now the first two acts are not consistent with acquiescence, on the contrary they show most clearly that Whittemore did not approve of the surrender; he proceeded at once to get back what Hamilton had given away, but his action was unavailing. It is true he did not openly declare war against his uncle and threaten to sue him; the many favors he had received and those he expected to receive doubtless restrained him in this respect; but Mr. Hamilton it would seem must have known that Whittemore did not sanction what he had so unadvisedly done. But the fact that Whittemore continued to make payments is of a different character. Such an act is undoubtedly indicative of a belief that he still owed Hamilton, but its significance and force as bearing on the question of ratifying the act of Hamilton depend on the amount Whittemore believed he owed Hamilton and the amount he considered he had lost by the unauthorized act of the latter. If he thought he had lost twenty-four thousand dollars, as the defendants assume, then Hamilton was owing him some ten thousand dollars. But there is nothing to warrant such an assumption. As Carll was insolvent he could not have considered the note of any value independently of the security,

and the committee has found it was of none; and as there was a prior mortgage of forty thousand dollars he must have considered his security of uncertain value under so heavy a burden. There is no reason to presume that he considered it of any greater value than the court has found it to be, namely, $8,304$\frac{81}{100}$, and as to this amount the defendants complain that it far exceeds the true value, if any there was. But taking the amount so found, it turns out that Whittemore was indebted to Hamilton all the while he was making his payments, and is now indebted to his estate in the sum of $3,142$\frac{39}{100}$. Our conclusion therefore is that the act of Hamilton in surrendering the security he held was not ratified by Whittemore either in law or in fact.

4. But the defendants claim that although they may have failed to show either an agency or a ratification, yet the conduct of Whittemore was such as to estop him from maintaining this suit. It is a sufficient answer to · say that nothing at all appears on the record to show that the position of Hamilton was in any respect changed for the worse, either by the acts or by the silence of Whittemore.

5. There still remains for consideration one further claim, which is that Whittemore, by electing to take his legacy under the will of Hamilton, ratified that will in all its parts, and that if he is allowed to recover in this suit he will defeat the full effect and operation of the will. This claim is founded on the well settled principle of equity that no one can be allowed to claim at the same time inconsistent rights with regard to the same subject. If the claim is under a will one cannot avail himself of its benefits as to a part and defeat its provisions as to other parts. Assuming for the purposes of the discussion that Whittemore has elected to take under the will, the question to be determined is, whether the act of taking the legacy is inconsistent with the prosecution of this suit to compel Hamilton's executors to credit on his account the value of the security surrendered. The answer depends on the true construction and meaning of the will.

After creating certain trusts and making sundry specific

Whittemore v. Hamilton.

bequests to individuals and charitable corporations, the residue of the estate by the eighth item in the will is to be divided equally among a large number of persons who are named, Whittemore being one of them. Then follows this provision:—"All moneys which I have paid over to the residuary legatees and remaining due at the time of my decease, it is my wish and I direct my executors to deduct the same from their share."

Now the object of this suit is merely to have the true and just amount which Whittemore owes Hamilton ascertained. The proceeding does not deny that every dollar of Whittemore's indebtedness must be taken from the legacy. There is then perfect harmony between the will and the purposes of this suit, and both may well stand together. A conflict over the amount of the debt is not a conflict with the provision in the will that requires such debt to be deducted, it rather co-operates with that provision so that it may be carried into effect.

But it may be suggested that the will in the ninth item indicates the sum or amount of debt to be deducted in the case of Whittemore. The language is:—"I declare the following to be a partial list of such claims as specified in item eighth: * * A claim against F. H. Whittemore for seven thousand dollars, with interest from January 1st, 1879; being money advanced by me at his solicitation and with his personal guarantee to redeem certain mortgaged property in New Haven; also sundry notes against said Whittemore in addition, amounting to several thousand dollars, and which notes will show the amount."

Now does this language mean that seven thousand dollars in one case and the additional amounts disclosed by the notes in the other should all be deducted, irrespective of the amounts justly due? We think not, but that the object was to identify the claims in a general way by reference to their nature and original amounts—in short, as item ninth says, "to make a partial list" of them. He knew when he used the language that Whittemore had for a long time previous been making payments, and we may presume that

he contemplated that he might in the future make other payments still further reducing the original sums. The eighth item of the will makes it certain that the intention was to have all the residuary legatees share equally; hence those who had received a part in his life time should take so much less; but if an arbitrary sum was to be deducted which did not represent the sum justly due, then inequality would be thereby introduced. But the case hardly calls for this reasoning, for the eighth item of the will, which must explain the ninth, in express language looks forward to the date of the testator's decease, and provides that only the moneys then remaining due shall be deducted. Whether therefore the original sums had been in part repaid or in part wiped out by an act of the testator that in law had that effect, (such as the misappropriation of a security in his hands,) it is only the balance justly due him at his decease which is to be deducted from the legacy.

There was no error in the judgment complained of.

In this opinion the other judges concurred.